**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

EVENTRESTROOMS.COM, LP                                                                    PLAINTIFF

v.                                          No. 3:08CV00182 JLH

ENTERGY SERVICES, INC.                                                                    DEFENDANT

**OPINION AND ORDER**

Eventrestrooms.com, L.P. ("Event") brought this action against Entergy Services, Inc. ("Entergy") alleging claims for breach of contract and quantum meruit. Entergy filed a counterclaim, alleging that Event overbilled Entergy for its services and that, as a result, Entergy is entitled to partial repayment for the amounts inappropriately invoiced. Entergy has filed a motion for summary judgment, and Event has responded. The Court, having reviewed all materials submitted by the parties and relied on for authority, hereby grants in part and denies in part Entergy's motion for summary judgment.

**I.**

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106

S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). A genuine issue exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

## II.

In August 2005, Hurricane Katrina caused significant damage to the coastal states along the Gulf of Mexico and to southern Louisiana in particular. Power, water, and sewer facilities were destroyed and required immediate repair. Entergy was responsible for repairing its electrical utilities in Louisiana and the surrounding states. In order to perform its work, Entergy sought logistical support from outside vendors, including companies that could provide portable restroom units for its on-site employees.

On September 2, 2005, Entergy Senior Procurement Specialist Jerl DuVall contacted Steve Reyna, Event's General Partner, to negotiate a service agreement for portable toilets for workers in southern Louisiana. DuVall and Reyna discussed the situation in Louisiana, the number of portable restrooms that Event had available for rent, and how quickly Event could deliver those units to Entergy sites in Louisiana. During their conversation, DuVall and Reyna never discussed the price that Entergy would pay for Event's services.

After speaking with Reyna, DuVall drafted and emailed Reyna a "Multipurpose Maintenance, Modification and Construction Services Stand-Alone Contract." The facts are unclear as to whether DuVall signed the contract before emailing it to Reyna. The parties do not dispute, however, that Reyna signed the contract and faxed the signature page back to DuVall.

The contract, which was signed and dated by both parties September 3, 2005, includes several terms that are material to this litigation:

6. <u>Invoicing and Payment</u>.

    6.1    For the satisfactory performance of Work, Owner agrees to pay Contractor the compensation due for the Work specified above upon acceptance of the Work by Owner and Owner's receipt of Contractor's properly prepared invoice for the completed Work subject to the Owner's right to withhold those portions of the charges set forth therein that the Owner may contest in good faith, and other applicable provisions thereof. . . .  All invoices submitted by Contractor shall be in the form and supported by such documentation as Owner may reasonably require. Any money due Contractor under this or other contracts between the parties shall be adjusted for amounts inappropriately invoiced, whether discovered prior or subsequent to payment by Owner. For all Work performed on time and material, unit price, or cost reimbursable basis, Contractor shall keep complete books or records and receipts of expenses to support charges billed. Overtime may be required in order to complete a specific portion of the Work or to carry out the Work effectively. If this is a fixed-price or lump-sum Contract, such overtime shall be deemed to be included as part of the fixed-price or lump-sum stated.

7. <u>Termination</u>. Owner reserves the right to terminate this Contract, at any time, and for any or no reason, upon prior written notice to Contractor. . . . In the event Work is terminated in accordance with this Section, Owner shall pay Contractor, subject to any other provisions of this Contract that may reduce or suspend payment, (a) according to the compensation provisions contained in this contract for non-lump sum or non fixed-price Work performed and obligations incurred prior to the termination, (b) for lump-sum or fixed-price Work, the percentage of any lump-sum or fixed-price which represents the percentage of the Work satisfactorily completed by Contractor, (c) for direct costs that Contractor incurs in terminating Work under the Contract, provided those costs (1) were authorized in advance by Owner and (2) are properly supported by timesheets, invoices and the like. Owner's sole liability to Contractor for termination is contained in this Section . . . .

38. <u>Entire Agreement</u>. This Contract, including all Exhibits constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, representations, agreements, or understandings, written or oral, with respect to the subject matter hereof. The various parts of this Contract are intended to be complementary; however, any conflicts between the body of this Contract and the Exhibits attached hereto shall be resolved in favor of the terms and conditions contained in the body of this Contract.

On September 3, 2005, Reyna prepared a service agreement for DuVall, which included a general service agreement, delivery schedule, and price list for Event's services. The service agreement also included a section labeled "Contract Term" that stated, "Term of this agreement will be ninty [sic] (90) days, end date December 3, 2005. Extension of this agreement my [sic] be extended by written request by rentor [sic] on or before end date stated above." A signature line appeared at the end of the service agreement for an "Authorized Entergy Representative." On September 3, Reyna faxed the agreement to DuVall. Neither DuVall nor anyone else from Entergy signed the service agreement. At the top of the agreement, however, DuVall handwrote "Exhibit B to Contract 10104842" and attached the agreement to the form contract between Entergy and Event that Reyna already had signed. DuVall testified in his deposition that, by doing so, he intended to make the service agreement part of the original contract. DuVall then faxed the original contract with the service agreement to Reyna. DuVall also mailed Reyna a hard copy of the entire contract.

After completing the contract, Event immediately relocated to New Orleans. From early September 2005 until October 9, 2005, Event provided Entergy with portable restroom units and serviced those units pursuant to the contract. Entergy received regular invoices billing Entergy for Event's services. Although Reyna had little other contact with anyone from Entergy during that time, he alleges that he acted under the direction and supervision of Steve Shapiro, an employee of Base Logistics, LLC, and base site coordinator for the Entergy base sites in New Orleans. In September and October 2005, Entergy paid Event $1,236,848.46 for its services.

On October 9, 2005, Entergy employee Tom Manasco notified Reyna that Entergy was closing two of its sites in Louisiana (Pontchartrain and Belle Promenade), and Entergy no longer needed Event's ninety-seven restroom units that were located at those sites. Reyna responded that

4

"Eventrestrooms has contract [sic] with Entergy Arkansas to provide portable restroom service in disaster area. 90 day minimum term of contract servicing Entergy staging camps." The next day, DuVall notified Reyna by email that Event should remove the ninety-seven units at Ponchartrain and Belle Promenade and that Entergy would not pay for any future servicing of those units. DuVall specified that Entergy did not intend to cancel the entire contract with Event; rather, it wanted Event to remove only the ninety-seven units that Entergy no longer needed. Reyna responded that "contracted services were for a minimum of 90 days. . . . [I]'m not sure how to react to this request." When Reyna proposed moving the units to other Entergy locations, DuVall did not respond.

On October 21, 2005, DuVall sent Reyna a final letter notifying him that Entergy was terminating the remainder of its contract with Event. After receiving the letter, Reyna, allegedly under the direction of Steve Shapiro, moved at least some of Event's inventory from the Entergy sites to a parking lot at the University of New Orleans for future use. However, Event received no further compensation from Entergy for those units. On November 10, 2008, Event filed suit against Entergy for allegedly breaching its contract with Event by terminating the contract before the end ninety days and failing to pay Event the total amount it was due under the ninety-day term in the service agreement. Alternatively, Event sought relief under a theory of quantum meruit for the services it provided to Entergy and for which it was not compensated. Entergy filed a counterclaim alleging that Event breached the contract with Entergy by overbilling Entergy for the services Event provided. After examining the invoices it received from Event, Entergy seeks to recover $236,220.00 for this alleged overbilling.

**III.**

Entergy claims that it is entitled to summary judgment on Event's quantum meruit and breach of contract claims and Entergy's breach of contract counterclaim. The parties agree–and the terms of the written agreement between Entergy and Event specify–that Louisiana law governs this dispute. Each count in the claim and counterclaim is addressed in turn below.

**A.      Quantum Meruit**

In recent decades, there has been some debate in Louisiana case law as to the appropriate treatment of a cause of action under the theory of quantum meruit. According to the Louisiana Civil Code, "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person." LA. CIV. CODE ANN. art. 2298 (2009). Although the Code nowhere mentions quantum meruit as the appropriate basis for recovery for such enrichment, Louisiana courts historically treated quantum meruit as a "codally unenumerated quasi-contract." *Fullerton v. Scarecrow Club, Inc.*, 440 So. 2d 945, 949 (La. Ct. App. 1983); *see also Alexis v. Pacaccio*, 410 So. 2d 867, 868 (La. Ct. App. 1982) (granting the plaintiff recovery under quantum meruit when no contract existed between the parties); *Customer Builders & Supply, Inc. v. Revels*, 310 So. 2d 862, 866 (La. Ct. App. 1975) (same).

In 1989, however, the Louisiana Supreme Court clarified the role of quantum meruit in Louisiana law:

> Quantum meruit may well have been an ill-considered importation from the common law (see that criticism in *Oil Purchasers v. Kuehling*, 334 So.2d 420 (La. 1976)); however, no great harm follows from that importation if we understand that numerous cases from our jurisprudence have used "quantum meruit" as a descriptive term, descriptive of the equitable principles of contract interpretation . . . .

*Morphy, Makofsky & Masson, Inc. v. Canal Place 2000*, 538 So. 2d 569, 574 (La. 1989). Today, quantum meruit is disfavored as a basis for recovery in Louisiana. *SMP Sales Mgmt., Inc. v. Fleet Credit Corp.*, 960 F.2d 557, 560 (5th Cir. 1992); *Fogleman v. Cajun Bag & Supply Co.*, 93-1177, p.3 (La. App. 3 Cir. 6/15/94); 638 So. 2d 706, 708. Rather, Louisiana courts apply the doctrine of unjust enrichment to plaintiffs' quantum meruit claims: "While the result reached under quantum meruit and unjust enrichment may often be the same, unjust enrichment is firmly rooted in our Civil Code and has well defined elements." *Fogleman*, 638 So. 2d at 709; *see also Bieber-Guillory v. Aswell*, 98-559, p. 6 (La. App. 3 Cir. 12/30/98); 723 So. 2d 1145, 1150.

To succeed on a cause of action for unjust enrichment: (1) the defendant must be enriched; (2) the plaintiff must be impoverished or harmed; (3) a causal connection must exist between the enrichment and the impoverishment; (4) the enrichment must be unjust; and (5) no other remedy must be available at law. *Minyard v. Curtis Prods., Inc.*, 205 So. 2d 422, 432-33 (La. 1968); *see also* LA. CIV. CODE ANN. art. 2298 (providing that compensation for enrichment under equity principles is not available if the law provides another remedy). Where a dispute between a plaintiff and defendant centers on the correct interpretation of a contract, but the facts indicate that a valid contract exists, another remedy is available at law; the plaintiff must recover, if at all, under contract law rather than quantum meruit. *Fogleman*, 638 So. 2d at 709. Thus, whether Entergy is entitled to summary judgment on Event's quantum meruit claim turns on whether Entergy and Event entered into a valid contract following their negotiations in September 2005.

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." LA. CIV. CODE ANN. art. 1906. Four elements are required for a valid contract: (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must

7

be freely given; (3) there must be certain object for the contract; and (4) the contract must have a lawful purpose. *Wallace v. Shreve Mem'l Library*, 79 F.3d 427, 430 n.4 (5th Cir. 1996); *Morphy*, 538 So. 2d at 572-73. Where there is no meeting of the minds between the parties, there is no consent, and thus no enforceable contract. *Blann v. Aldige*, 712 So. 2d 1052, 1053-54 (La. Ct. App. 1998). If consent is lacking on the part of one who signs a contract, the physical act of signing the contract has no effect. *Jones v. Janes*, 101 So. 116, 117 (La. 1924).

In the case at hand, Entergy and Event entered into a valid contract for services. As evidence of the agreement, Entergy offers a copy of the written contract. Entergy claims that it made an offer to Event on September 2, 2005, when DuVall emailed the typewritten Entergy contract to Reyna. According to Entergy, by return fax with Reyna's signature, Event accepted Entergy's offer. Event disputes whether several provisions that appear in the copy were included in the original contract that Reyna signed; however, Event does not dispute that a valid contract between Entergy and Event in fact existed. Event concedes that DuVall and Reyna, on behalf of Entergy and Event, respectively, entered into a valid contract whereby Event agreed to supply the Entergy sites in southern Louisiana with portable toilets, and in turn, Entergy agreed to compensate Event for delivering and servicing the toilets. Event also agrees that DuVall and Reyna consented to the terms of the written contract that DuVall emailed to Reyna on September 2, 2005. According to Event, when Reyna signed the contract, there was a meeting of the minds, or mutual assent, as to the contract's terms. Event agrees that by signing the contract and faxing the last page to DuVall, Reyna bound Event to the terms of the written agreement. Because the parties agree and the evidence indicates that Event and Entergy entered into a valid contract dated September 3, 2005, no reasonable jury could find in favor of

Event under a theory of quantum meruit. As a result, the defendant is entitled to summary judgment on Event's quantum meruit claim.

**B.      Breach of Contract**

Entergy also moves for summary judgment on Event's breach of contract claim. Under Louisiana law, "[t]he common intent of the parties is the controlling factor in interpreting a contract." *Emert v. Hartford Ins. Co.*, 559 So. 2d 467, 474 (La. 1990) (citing LA. CIV. CODE ANN. art. 2045)). In a written contract, the parties' intent is ordinarily determined by the four corners of the instrument. *Bartlett Constr. Co. v. St. Bernard Parish Council*, 99-CA-1186, p. 3-4 (La. App. 4 Cir. 5/31/00); 763 So. 2d 94, 97-98. When the words of a contract are clear, no further interpretation is necessary to search for the parties' intent. LA. CIV. CODE ANN. art. 2046. However, where a contract permits of two reasonable constructions, the contract is deemed ambiguous and summary judgment is inappropriate because the proper interpretation of the contract becomes a question of fact. *Adm'rs of Tulane Educ. Fund v. Debio Holding, S.A.*, 177 F. Supp. 2d 545, 548 (E.D. La. 2001); *Eiche v. E. Baton Rouge Parish Sch. Bd.*, 92-CA-1158, p. 4 (La. App. 1 Cir. 07/02/93); 623 So. 2d 167, 170.

Entergy first contends that no genuine fact question exists regarding compensation because the written contract specifies that Entergy was to compensate Event on a per unit basis. In support of this argument, Entergy points to section 4 of the contract, which states, "Compensation shall be unit price for delivery, rental fees, service costs and removal of portable restroom units as defined in Exhibit B, attached." Entergy also notes that the service agreement, which DuVall attached to the contract as Exhibit B, lists the delivery, service, and return rates of Event's portable toilets per unit. Delivery and return rates are listed per mile per truck, and service rates are listed per toilet. Entergy

9

also notes that nothing in the contract specifically states that compensation shall be on a lump sum basis. Based on this evidence, Entergy claims that it was to pay Event on a per unit basis for the services Event performed.

Event disputes this claim. First, Event claims that section 4 of the agreement was not included in the original contract that DuVall emailed to Reyna. Event points to DuVall's testimony, in which he stated, "I prepared the contract, *SANS Sections 3 and 4*, which is the Scope And Compensation Sections," to suggest that DuVall inserted those sections after Reyna signed the contract. Event also points to the third page of the service agreement that Reyna drafted. Event claims that the section of the service agreement entitled "Contract Term" and the provision contained therein made the contract one for a fixed term of ninety days. The provision states, "Term of this agreement will be ninty [sic] (90) days, end date December 03, 2005. Extension of this agreement my [sic] be extended by written request by rentor [sic] on or before end date stated above." According to Event, by including a fixed term in the agreement, Event was guaranteed a minimum fixed amount of compensation for its services. However, DuVall testified that the ninety-day provision bound Event, not Entergy; the provision meant that Event would make the portable toilets available to Entergy at the unit prices listed in the service agreement for ninety days.

Based on the proffered evidence, genuine issues of material fact exist as to whether Entergy was obligated under the contract to compensate Event on a per unit or lump sum basis. First, the parties dispute whether section 4, entitled "Compensation," was included in the original contract that Reyna signed. Event offered DuVall's statement that "[he] prepared the contract, SANS Sections 3 and 4," to suggest that section 4 was added after Reyna signed the contract. Entergy, on the other hand, claims that Reyna received and signed the entire contract, including section 4; the only

10

subsequent addition to the contract was the service agreement that Reyna drafted. Whether section 4 was included in the original contract could clarify whether compensation was on a per unit basis or for a lump sum and, therefore, constitutes a genuine issue of material fact.

The parties also dispute the meaning of two terms that Reyna included in the service agreement: the ninety-day term and the price list. DuVall testified that the ninety-day term did not make the contract one for a fixed term; Reyna testified that it did. Furthermore, Entergy claimed that the price list indicated per unit compensation, while Reyna testified that the price list, when coupled with the ninety-day contract term, established a fixed minimum price for Event's services. Because both proffered constructions of the service agreement are reasonable, the agreement is ambiguous and gives rise to a genuine issue of material fact.

Entergy also argues that, even if the ninety-day provision in the service agreement made the contract one for a fixed term, the contract was terminable at will pursuant to sections 7 and 38 of the agreement. According to section 7, Entergy reserved the right to terminate the contract at any time and for any reason upon prior written notice to Event. Furthermore, in the event that the contract was terminated, Entergy was obligated to pay Event, "for lump-sum or fixed-price Work, the percentage of any lump-sum or fixed-price which represents the percentage of the Work satisfactorily completed by Contractor." Entergy suggests that, to the extent this provision conflicts with the ninety-day provision in the service agreement, section 7 is controlling. According to section 38, "any conflicts between the body of this Contract and the Exhibits attached hereto shall be resolved in favor of the terms and conditions contained in the body of this Contract."

Event, on the other hand, claims that section 7 is not controlling, and Entergy did not have the right to terminate its agreement with Event because section 7 is in direct conflict with the ninety-

day term in the service agreement.  Although section 38 addresses conflicts between the body of the contract and attached exhibits, Event claims that the service agreement was an *amendment* to the original contract that *modified* the terms of the agreement.  In fact, DuVall and Reyna both testified that DuVall unilaterally wrote "Exhibit B" at the top of the service agreement after Reyna already had signed the agreement and before it was attached to the contract.  Entergy offers no evidence that Reyna wanted the service agreement to become an exhibit to the contract rather than an amendment.  Rather, Reyna testified that by getting back the service agreement and the contract, he "accepted it as a final agreement or satisfactory to meet [his] requirements."

Given this evidence, a genuine issue of material fact exists as to whether the parties agreed that the ninety-day provision, along with the rest of the service agreement, would amend the contract or merely attach as an exhibit. According to Entergy, the service agreement was inserted into the original contract as Exhibit B and did not modify the terms of the existing contract.  According to Event, the service agreement amended the contract and modified the existing provisions.  Because both interpretations of the service agreement are reasonable, the effect of the service agreement on the existing contract is ambiguous, and this determination should be left to the fact-finder.

Finally, Entergy claims that, regardless whether compensation was on a per unit basis or the contract was terminable at will, Event's compensation is limited to payment for work actually performed.  To support this argument, Entergy references section 6, which says that Event should prepare invoices "for the completed Work," and section 7, which reserves with Entergy the right to terminate the contract at any time.  Entergy also alleges in its counterclaim that Event continued to invoice Entergy after Entergy terminated its contract with Event, and as a result, Entergy overpaid Event in the amount of $357,249.46.  Thus, Entergy claims that Event was not entitled to receive

payment for work not yet performed but, through improper invoicing, did receive funds in excess of the agreed-upon value of its work.

Although Entergy's argument is a cogent one, as explained above, the relevance of sections 6 and 7 turn on whether the service agreement *amended* these provisions or was to be read *in light of* these provisions. Event contends that the service agreement amended the contract; Entergy contends that the service agreement became an exhibit to the contract. Thus, genuine issues of material fact regarding the appropriate treatment of the service agreement remain.[1]

For the reasons stated above, summary judgment as to the plaintiff's breach of contract claim and Entergy's counterclaim is denied.

## CONCLUSION

Entergy's motion for summary judgment is GRANTED as to the plaintiff's quantum meruit claim and DENIED as to the plaintiff's breach of contract claim and Entergy's breach of contract counterclaim.

IT IS SO ORDERED this 2nd day of September, 2009.

J. Leon Holmes

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[1] Entergy suggests that even if it breached the contract, summary judgment is warranted because Event failed to mitigate its damages. Although Entergy correctly asserts that Event had a duty to mitigate, it wrongly assumes that Event did not suffer any losses other than those arising from a failure to mitigate. *See* LA. CIV. CODE ANN. art. 2298. Even if Entergy admitted it was in breach, the pecuniary value of Event's damages would be a genuine issue of material fact.