**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

EVENTRESTROOMS.COM, LP                                                                    PLAINTIFF

v.                                         No. 4:10CV00153 JLH

ENTERGY SERVICES, INC.                                                                    DEFENDANT

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a breach of contract case.[1] Each party alleges that the other breached the contract into which they had entered. The central issue is one of contract interpretation. Eventrestrooms.com, L.P. ("Event") claims that the parties contracted for services for a minimum of 90 days and that Entergy Services, Inc. ("Entergy") breached the contract by terminating it early. Entergy claims that the contract was terminable at will, that it was overbilled by Event and that it overpaid, and that Event breached the contract by not refunding the overpayment. After a bench trial, the Court now finds and concludes as follows.

**I. FACTUAL HISTORY**

In August 2005, Hurricane Katrina caused significant damage to the coastal states along the Gulf of Mexico and to southern Louisiana in particular. Power, water, and sewer facilities were destroyed and required immediate repair. Entergy was responsible for repairing its electrical utilities in Louisiana and the surrounding states. In order to perform its work, Entergy sought logistical support from outside vendors, including companies that could provide portable toilets.

On September 2, 2005, Entergy Senior Procurement Specialist Jerl DuVall contacted Steve Reyna, Event's General Partner, to negotiate a service agreement for portable toilets for workers in

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

southern Louisiana. DuVall and Reyna discussed the situation in Louisiana, the number of portable toilets that Event had available for rent, and how quickly Event could transport those units from eastern Arkansas, where Event was located, to southern Louisiana. Reyna asked DuVall how long Entergy would need the portable toilets, and DuVall answered that he did not know. The only discussion of price occurred when DuVall asked Reyna to send him a price list.

After speaking with Reyna, DuVall drafted and emailed Reyna a "Multipurpose Maintenance, Modification and Construction Services Stand-Alone Contract," using a standard form contract often used by Entergy. DuVall left blank spaces where provisions would later be inserted relating specifically to the services Event would render and the price Entergy would pay for those services. DuVall did not sign the document before emailing it to Reyna, but Reyna signed the document and faxed the signature page back to DuVall.

The form contract included the following provisions:

6. <u>Invoicing and Payment</u>.

    6.1    For the satisfactory performance of Work, Owner agrees to pay Contractor the compensation due for the Work specified above upon acceptance of the Work by Owner and Owner's receipt of Contractor's properly prepared invoice for the completed Work subject to the Owner's right to withhold those portions of the charges set forth therein that the Owner may contest in good faith, and other applicable provisions thereof. . . . All invoices submitted by Contractor shall be in the form and supported by such documentation as Owner may reasonably require. Any money due Contractor under this or other contracts between the parties shall be adjusted for amounts inappropriately invoiced, whether discovered prior or subsequent to payment by Owner. For all Work performed on time and material, unit price, or cost reimbursable basis, Contractor shall keep complete books or records and receipts of expenses to support charges billed. Overtime may be required in order to complete a specific portion of the Work or to carry out the Work effectively. If

this is a fixed-price or lump-sum Contract, such overtime shall be deemed to be included as part of the fixed-price or lump-sum stated.

7. <u>Termination</u>. Owner reserves the right to terminate this Contract, at any time, and for any or no reason, upon prior written notice to Contractor. . . . In the event Work is terminated in accordance with this Section, Owner shall pay Contractor, subject to any other provisions of this Contract that may reduce or suspend payment, (a) according to the compensation provisions contained in this contract for non-lump sum or non fixed-price Work performed and obligations incurred prior to the termination, (b) for lump-sum or fixed-price Work, the percentage of any lump-sum or fixed-price which represents the percentage of the Work satisfactorily completed by Contractor, (c) for direct costs that Contractor incurs in terminating Work under the Contract, provided those costs (1) were authorized in advance by Owner and (2) are properly supported by timesheets, invoices and the like. Owner's sole liability to Contractor for termination is contained in this Section . . . .

38. <u>Entire Agreement</u>. This Contract, including all Exhibits constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, representations, agreements, or understandings, written or oral, with respect to the subject matter hereof. The various parts of this Contract are intended to be complementary; however, any conflicts between the body of this Contract and the Exhibits attached hereto shall be resolved in favor of the terms and conditions contained in the body of this Contract.

On September 3, 2005, Reyna prepared a document entitled "Service Agreement," which included a description of the services that Event would provide, a delivery schedule, and a price list for Event's services. This document provided that Event would provide 340 portable toilets to four campsites (85 per site), would clean each toilet every day, and would bill in advance. This document provided per unit and per service rates pursuant to which Entergy would compensate Event. This document also included a section labeled "Contract Term" that stated, "Term of this agreement will be ninty [sic] (90) days, end date December 3, 2005. Extension of this agreement my [sic] be extended by written request by rentor [sic] on or before end date stated above." A signature line appeared at the end of the service agreement for an "Authorized Entergy Representative." On

September 3, Reyna faxed the agreement to DuVall. Neither DuVall nor anyone else from Entergy signed the document. At the top of the document, however, DuVall handwrote "Exhibit B to Contract 10104842," and he attached the document to the form contract that Reyna already had signed. DuVall also inserted into the form contract the following provisions:

> Work to be performed by Contract shall include, but not be limited, to the following:
>
> • All labor and equipment necessary to deliver, stage, service and remove three-hundred forty (340) portable restrooms to emergency restoration operations areas in the West New Orleans area as direct by Owner personnel and as described in Exhibit B attached to this Contract.
>
> 4. **Compensation.** Compensation shall be unit price for delivery, rental, fees, service costs and removal of portable restroom units as defined in Exhibit B, attached.

DuVall then faxed the contract with Exhibit B to Reyna. DuVall also mailed Reyna a hard copy of the contract.[2]

On the morning of September 4, 2005, Event began moving portable toilets to New Orleans, initially setting up the portable toilets at four locations where Entergy had established camps and staging areas. Those four camps were identified as Pontchartrain Center, Boomtown Casino, Belle Promenade, and Camp Katrina (Nuclear). In September and October of 2005, Event provided Entergy with portable toilets and serviced those units pursuant to the contract. Entergy received regular invoices billing Entergy for Event's services.

On October 9, 2005, Entergy employee Tom Manasco notified Reyna that Entergy was closing two of its sites in Louisiana (Pontchartrain and Belle Promenade), and Entergy no longer

---

[2] The Court hereinafter will refer to the portion of the contract drafted by DuVall using the Entergy form as the main body of the contract and the portion drafted by Reyna as Exhibit B to the contract.

needed Event's 97 restroom units that were located at those sites. Reyna responded that "Eventrestrooms has contract [sic] with Entergy Arkansas to provide portable restroom service in disaster area. 90 day minimum term of contract servicing Entergy staging camps." On the next day, DuVall notified Reyna by email that Event should remove the 97 units at Pontchartrain and Belle Promenade and that Entergy would not pay for any future servicing of those units. DuVall stated that Entergy did not intend to cancel the entire contract with Event; rather, Entergy wanted Event to remove only the 97 units that were no longer needed. Reyna responded that "contracted services were for a minimum of 90 days. . . . [I]'m not sure how to react to this request." When Reyna proposed moving the units to other Entergy locations, DuVall did not respond.

On October 21, 2005, DuVall sent Reyna a letter notifying him that Entergy was terminating the remainder of its contract with Event. After receiving the letter, Reyna moved at least some of the portable toilets from the camps to the University of New Orleans where Entergy had established a camp and staging area. The camp at UNO used portable toilets from another company. Entergy allowed Event to store portable toilets at the UNO site but did not use them. Event received no further compensation from Entergy for those units. Reyna testified that his employee, Kierston Anderson, was instructed by Steve Shapiro to move the portable toilets to UNO. Shapiro was an employee of Base Logistics, a company that provided logistical support to Entergy. Anderson testified, however, that she was instructed to move the portable toilets to UNO by Reyna, not Shapiro. The evidence established that Shapiro had no authority, actual or apparent, to give directions to Event on Entergy's behalf.

On June 1, 2007, Entergy wrote Reyna, stating that a review of the invoices showed that Entergy overpaid Event by a minimum of $236,220. The parties have stipulated that Event sent

5

invoices to Entergy totaling $1,657,049, and that Entergy paid Event a total of $1,236,848.46. Evidence also received by stipulation established that Event provided services with a value of $879,599, based on the pricing provisions in Exhibit B to the contract.

## II. CONTRACT INTERPRETATION

The main body of the contract specified that Entergy was to compensate Event on a per unit basis. Section 4 stated, "Compensation shall be unit price for delivery, rental fees, service costs and removal of portable restroom units as defined in Exhibit B, attached." Exhibit B stated the delivery, service, and return rates of Event's portable toilets on a per unit basis. Delivery and return rates were listed per mile per truck, and service rates were listed per toilet. Nothing in the main body of the contract nor in Exhibit B to the contract stated that compensation would be on a lump sum basis. Therefore, Entergy was obligated to pay Event on a per unit basis for the services that Event actually performed.

Event disagrees. Event argues that the parties agreed on a minimum contract term of 90 days, which effectively converted the contract to one for a lump sum payment. The pertinent provision in Exhibit B stated, "Term of this agreement will be ninty [sic] (90) days, end date December 03, 2005. Extension of this agreement my [sic] be extended by written request by rentor [sic] on or before end date stated above." According to Reyna, by accepting the 90-day term in the agreement, Entergy guaranteed to Event a minimum fixed amount of compensation whether Entergy used any of Event's services or not. DuVall testified contrary to Reyna. According to DuVall, the 90-day provision meant that Event would make the portable toilets available to Entergy at the prices listed in Exhibit B for 90 days, not that Entergy was guaranteeing payment for 90 days of service whether it used the services or not.

Although the contract is ambiguous, Entergy's interpretation is more reasonable than Event's. According to section 7, Entergy reserved the right to terminate the contract at any time, and for any reason or no reason, upon prior written notice to Event. According to section 38, "any conflicts between the body of this Contract and the Exhibits attached hereto shall be resolved in favor of the terms and conditions contained in the body of this Contract." The parties agreed that the interpretation of the contract would be governed by the laws of the state where the work was to be performed, which was Louisiana. In Louisiana, "Each provision in a contract must be interpreted in light of other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. Art. 2050. Adopting Event's interpretation would require a finding that the 90-day provision in Exhibit B nullified section 7 and section 38 of the main body of the contract. Had Reyna intended not to agree to sections 7 and 38, he could have stricken those terms before signing the contract, but he did not; or he could have stated in Exhibit B that the provisions in Exhibit B superseded sections 7 and 38 of the main body of the contract, but he did not. He did nothing and said nothing to suggest that he interpreted Exhibit B to conflict with and supersede sections 7 and 38 of the main body of the contract.

Viewing the contract as a whole and giving meaning to all its parts, the contract provided for specific services to be performed by Event for which Entergy would pay on a unit price basis for work actually performed. Event agreed that it would provide the specified services at the specified prices for 90 days, after which the prices would be subject to renegotiation. Entergy reserved the right, however, to terminate the contract at any time, and for any reason or no reason. To put it more simply, Event's price list was good for 90 days, but the contract did not require Entergy to pay for Event's services for a minimum of 90 days.

This conclusion is supported not only by the language of the contract as a whole but also by the language of the 90-day provision drafted by Reyna and included in Exhibit B. That provision stated that the term of the agreement would be 90 days, with an end date of December 3, 2005; and it provided that the agreement could be extended by written request of Entergy before December 3. Event construes that language to state a minimum term, but the language used suggests that it established a maximum term (absent an extension). The provision was written so that an extension would be required for the contract to continue past December 3, which is quite different from saying that the contract could not be terminated before December 3. If the parties had intended the provision to mean what Event claims, the provision should have said, "Term of this agreement will be ninety (90) days, end date December 3, 2005. This agreement may not be terminated before that date." That is not, however, what the provision says.

Entergy terminated the contract as to 97 units on October 9, 2005, and it terminated the contract in its entirety on October 21, 2005. Entergy's actions in terminating the contract did not constitute a breach because Entergy was entitled under the terms of the contract to terminate the contract at any time, and for any reason or no reason.

### III. OVERPAYMENT

The contract entered into by Entergy and Event required Entergy to compensate Event based on the unit prices specified in Exhibit B to the contract for services actually provided prior to the termination of the contract. Between September 3, 2005, and the termination of the contract, Event provided $879,599.00 of services to Entergy per the contract. Event sent invoices to Entergy totaling $1,657,049. Entergy made payments of $1,236,848.46 to Event, resulting in overpayments by Entergy to Event in the amount of $357,249.46. Section 21.1 of the contract provides, in part, that

Event must reimburse Entergy for payments of any inappropriately invoiced amounts. Event failed to repay $357,249.46 which was overpaid by Entergy upon Event's invoices, and therefore Event breached its contract with Entergy causing damages in the amount of $357,249.46.

Entergy is entitled to judgment in its favor upon the Complaint of Event for breach of contract. Entergy is entitled to recover damages from Event in the amount of $357,249.46[3] plus prejudgment interest pursuant to Louisiana law[4] and post-judgment interest pursuant to 28 U.S.C. § 1961. The parties have briefed the issue of prejudgment interest and agree on all but one issue, which is whether the prejudgment interest from June 1, 2007 until January 30, 2010, should be based on a principal amount of $236,220 (the amount demanded by Entergy in its demand letter and its counterclaim) or $357,249.46 (the amount stipulated as the overpayment based on services actually rendered). The law in Louisiana seems to be that interest runs from the date of judicial demand even if the damages are not ascertainable until trial. *Trans-Globe Alloy Ltd. v. First Nat'l Bank of Jefferson*, 583 So. 2d 443, 457-58 (La. 1991); *Bradford v. Onshore Pipeline Const. Co., Inc.*, 853 So. 2d 756, 767 (La. App. 2nd Cir. 2003). Based on that rule of law, prejudgment interest is calculated as follows:

---

[3] Entergy's counterclaim, like its demand letter of June 1, 2007, requested damages in the amount of $236,220. Evidence showing that the overpayment actually was $357,249.46 was received by stipulation. *See* Fed. R. Civ. P. 15(b)(2).

[4] *See* La. C.C. Art. 2000 (2008); La. R.S. 9:3500; and La. R.S. 13:4204.

9

June 1, 2007 - November 30, 2008, 18 months on $236,220 and December 1, 2008 through August 1, 2010, 20 months on $357,249.46:

| Year | Interest Rate | Principal | Annual Interest | Monthly Interest | No. of Months | Total |
|---|---|---|---|---|---|---|
| 2007 | 9.50% | $236,220.00 | $22,440.90 | $1,870.08 | 7 | $13,090.56 |
| 2008 | 8.50% | 236,220.00 | 20,078.70 | 1,673.23 | 11 | 18,405.48 |
| 2008 | 8.50% | 357,249.46 | 30,466.20 | 2,530.52 | 1 | 2,530.52 |
| 2009 | 5.50% | 357,249.46 | 19,648.72 | 1,637.39 | 12 | 19,648.72 |
| 2010 | 3.75% | 357,249.46 | 13,396.85 | 1,116.40 | 7 | 7,814.83 |
|  |  |  |  |  | Total | $61,490.11 |

## CONCLUSION

The Court finds in favor of Entergy Services, Inc., on the claims of Eventrestrooms.com, L.P., and on Entergy's counterclaim. A judgment will be entered separately in favor of Entergy Services, Inc., in the amount of $357,249.46, plus prejudgment interest in the amount of $61,490.11 for a total of $418,739.57, plus post-judgment interest pursuant to 28 U.S.C. § 1961 at the rate of 0.26% per annum.

IT IS SO ORDERED this 30th day of August, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE